IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| JUDY WOOLF,<br><br>    Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | ORDER AND<br><br>MEMORANDUM DECISION<br><br><br><br>Case No. 1:06 CV 017 (TC) |

  Between October 2003 and June 2004, Christopher Jones was involved in a fatal accident near the Grizzly Peak 4x4 Road, a rugged, single-lane path that runs along a mountainous ridge in the Wasatch-Cache National Forest. Although the exact circumstances and precise date of Mr. Jones's death are unknown, his mother, Judy Woolf, argues in this suit that he died while four-wheeling[1] in his truck. Ms. Woolf further argues that the United States negligently failed to maintain the Grizzly Peak 4x4 Road and negligently failed to warn users about the road's allegedly dangerous condition that caused her son's accident. Because the court concludes that it lacks subject matter jurisdiction and that Utah statute otherwise bars Ms. Woolf from bringing her suit, the United States' motion for summary judgment is granted.

**BACKGROUND**

  The following material facts are not disputed and presented in the light most favorable to

---

[1] Four-wheeling is a term used to describe recreational travel in a four-wheel-drive vehicle over rugged natural terrain, which may include large rocks, streams, mud and sand.

Ms. Woolf as the nonmoving party. See Kellogg v. Metro. Life Ins. Co., 549 F.3d 818, 825 (10th Cir. 2008).

### 1. General Road Maintenance and Sign Placement Procedures

The National Forest Road System consists of more than 380,000 miles of roads, which range from double-lane paved highways to single-lane unpaved paths. The Wasatch-Cache National Forest, which is located in northern Utah and divided into six districts, contains approximately 1,400 miles of these roads. This includes approximately 1,000 miles of so-called Maintenance Level Two roads, which are narrow, rocky, single-lane, and limited to high clearance traffic. The Grizzly Peak 4x4 Road is a Maintenance Level Two road.[2] The Forest Service Handbook, provides a general outline of the maintenance system that should be used for these roads. The Handbook is produced by the Forest Service, the federal agency that manages some 193 million acres of public lands in national forests and grasslands.

Each year in the Wasatch-Cache National Forest, the road maintenance supervisor creates a road maintenance plan under the direction of the Forest engineer. This road maintenance plan is a list of projects, prioritized based on such factors as the condition of a road, the number of users, the records of previous maintenance, the geographic proximity, and whether a project was completed during the previous season.

The Forest engineer reviews the road maintenance plan to make sure that it is consistent with public health and safety requirements, resource protection, and other considerations, and creates a road maintenance schedule, which is a preliminary list of projects to be accomplished

---

[2]The maintenance level of a road indicates the level of service that should generally be provided. The Forest Service provides a list of factors that personnel should to consider when assigning a maintenance level to a particular road. (Ex. 3, 5, Def.'s Mem. Supp. Summ. J., Docket No. 10.) These factors include the needs of the resource program, the level of traffic the road serves, user safety, intended travel speed, service life, and current operational status. (Id.)

during a given maintenance season.  Significantly, the road maintenance schedule is a "working document," which means that "depending on a number of factors, including availability of resources, funding, weather conditions, and the need to respond to emergencies, natural disaster or unplanned needs, projects are either completed, postponed or substituted as necessary." (Suppl. Decl. Kay Shurtz, 2, Docket No. 26.)  Each district has its own list of road maintenance projects ordered by priority.

At the end of each maintenance season, Forest Service employees issue an annual roads report.  This report summarizes the work that was completed considering various time, personnel, and budget limitations.  Forest Service personnel consider unfinished projects again the following year.  Notably, the Ogden District, which oversees sign and road maintenance in the area that includes the Grizzly Peak 4x4 Road, does not maintain logs of its road maintenance work.

Individual districts like the Ogden District are responsible for placing and maintaining signs on Maintenance Level Two roads.  The Highway Safety Act's requirements do not govern Maintenance Level Two roads.  Each district creates its own annual sign plan, orders the necessary signs, and hires a crew to install and maintain signs during the maintenance season. The sign coordinator, who is also the road maintenance supervisor, approves sign orders, provides advice, and performs spot checks to ensure proper installation and signing.  The Ogden District does not maintain written annual sign plans.

  **2.**  **Mr. Jones and the Grizzly Peak 4x4 Road**

In July 2000, the Ogden District road crew concluded that the Grizzly Peak 4x4 Road was

not passable beyond the 1.493 mile point.[3]  Consequently, during the summer of 2002, the Ogden district concluded that the 1.493 mile point was the "logical end" of the road.  (Supp. Decl. Juan Barrientez, 2, Docket No. 28.)  Forest Service employees did not travel beyond the 1.493 mile point when making this determination.  The Forest Service placed a "No Motor Vehicles" post approximately .5 miles east of the 1.493 mile point on the Grizzly Peak 4x4 Road or 1.0 miles from where the road began.[4]  During the summer of 2003, the Forest Service placed a sign at the beginning of the Grizzly Peak 4x4 Road that indicated the road was open but restricted to use by high clearance vehicles.  The only way that vehicles could enter the Grizzly Peak 4x4 Road, which dead ends, is by way of the Willard Mountain Road.

At some point between October 28, 2003, and June 13, 2004, Mr. Jones was involved in a fatal accident on the Grizzly Peak 4x4 Road.  His accident likely occurred approximately 1.7 miles down the Grizzly Peak 4x4 Road, or about .7 miles past where Forest Service personnel had placed the no vehicles sign.  Before Mr. Jones's accident in 2003, the Forest Service had not received any report of a motor vehicle accident on the Grizzly Peak 4x4 Road.

Ms. Woolf reported Mr. Jones missing on October 29, 2003.  Family members suggested that he might have gone to Willard Peak, the area of the Wasatch-Cache National Forest where the Grizzly Peak 4x4 Road is located.  Between October 2003 and June 2004, the Sheriff's Office investigated these and other tips to no avail.

---

[3]Ms. Woolf argues that there was a rock slide on the Grizzly Mountain 4x4 Road past the 1.493 mile point at the time of her son's accident.  Her only evidence in support of this argument are photographs taken in June 2004, months after Mr. Jones disappeared and investigators recovered his body.  According to the United States, the Forest Service was unaware of a rockslide before June 2004.

[4]By the time in June 2004 that Forest Service personnel were investigating Mr. Jones's accident, the sign was no longer posted.  Significantly, Ms. Woolf does not produce evidence regarding when the sign was removed and whether its removal was a factor in Mr. Jones's accident.

On June 13, 2004, some people on all-terrain vehicles near Willard Peak noticed a pickup truck, which was later identified as Mr. Jones's. When law enforcement reached the truck, they found that the ignition was on and the transmission was in four-wheel-drive low. Mr. Jones's body was found in the wilderness area near the truck. After completing an examination, the medical examiner reported that Mr. Jones "appear[ed] to have died as a consequence of a motor vehicle accident," but could not identify the specific nature of his injuries.[5] (Ex. 12, Def.'s Mem. Supp. Summ. J., Docket No. 10.)

Ms. Woolf filed this suit pursuant to the FTCA. (Compl. Docket No. 1.) She argues that Mr. Jones died as a proximate result of the United States' negligence in failing to maintain the Grizzly Peak 4x4 Road[6] and its negligence in failing to warn drivers of an allegedly hazardous condition on that road. The United States moves this court for summary judgment.

## ANALYSIS

Summary judgment is appropriate when the record demonstrates "no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Kellogg v. Metro. Life Ins. Co., 549 F.3d 818, 825 (10th Cir. 2008); Pignanelli v. Pueblo Sch. Dist., 540 F.3d 1213, 1216 (10th Cir. 2008). The moving party bears the initial

---

[5]There is no evidence in the record that would conclusively demonstrate the cause of the Mr. Jones's accident. Although Ms. Woolf suggests that a rock slide on the Grizzly Peak 4x4 Road caused her son's accident, she does not submit evidence to support this claim. The police report from Mr. Jones's accident suggests that an "old fence post that was sticking up into the trail" might have been the cause of the accident. (Ex. 10, 12, Def.'s Mem. Supp. Summ. J., Docket No. 10.) Moreover, the United States offers evidence that would support a variety of additional theories for the cause of the accident, including the severe winter storm that forced rescuers to call off the search for Mr. Jones on October 30, 2003. But all of these are merely unsubstantiated theories.

[6]Although in her Complaint Ms. Woolf identifies hazardous conditions on the Willard Basin Road as the cause of her son's accident, it is obvious from briefing and the hearing before the court that the parties agree that the Grizzly Peak 4x4 Road is where the accident actually occurred.

burden of demonstrating the absence of any genuine issue of material fact. The court must consider the evidence and any reasonable inferences in the light most favorable to the nonmoving party. Mosier v. Callister, Nebeker & McCullough, 546 F.3d 1271, 1275 (10th Cir. 2008).

I.  **THE UNITED STATES DID NOT WAIVE ITS SOVEREIGN IMMUNITY TO ALLOW FOR MS. WOOLF'S CLAIMS.**

The FTCA generally waives the sovereign immunity of the United States for liability from the "negligent or wrongful act or omission" of a federal employee "acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). But the Act excludes from liability those actions that fall within the so-called "discretionary function" exception. The United States has not waived sovereign immunity for suits from liability "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty." Id. § 2680(a).

To determine whether the discretionary function applies, a court must conduct the two-part inquiry announced in Berkovitz v. United States, 486 U.S. 531, 536 (1988). First, the court must determine whether the challenged decision involved "'an element of judgment or choice,' in which case it is discretionary and falls within the language of the exception." Kiehn v. United States, 984 F.2d 1100, 1102 (10th Cir. 1993) (quoting Berkovitz, 486 U.S. at 536). The exception does not apply if the challenged conduct "involves 'a federal statute, regulation or policy [that] specifically prescribes a course of action for an employee to follow.'" Id. (quoting Berkovitz, 486 U.S. at 536). Second, if the court concludes that the conduct involves discretionary judgment, then it must next consider "'whether that judgment is the kind that the discretionary function exception was designed to shield.'" Id. (quoting Berkovitz, 486 U.S. at 537). The discretionary function exception guards against "'judicial 'second guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium an action in tort.'" Id. (quoting Berkovitz, 486 U.S. at 536-37).

As previously explained, Ms. Woolf argues here that the United States was negligent in failing to maintain and repair the Grizzly Peak 4x4 Road and in failing to warn users about its allegedly dangerous condition. The court will consider each of Ms. Woolf's challenges applying the <u>Berkovitz</u> test.

### A.     First Step of <u>Berkovitz</u>

Ms. Woolf concedes that the creation of the road maintenance plan, the road maintenance schedule and the annual sign plan were discretionary acts. She argues, though, that once these actions were taken, "there was no judgment or choice as to what action the [United States] would or would not take in maintaining roads and placing signs. At that point the matter was clear that the plans, lists and schedules must be followed." (Pl.'s Mem. Opp'n, 8, Docket No. 14.) Considering the facts of Ms. Woolf's case, the court finds the facts and reasoning of <u>Elder v. United States</u>, 312 F.3d 1172 (10th Cir. 2002), particularly instructive.

In <u>Elder</u>, two parents brought suit against the United States for the wrongful death of their 12-year-old son. While trying to cross a small stream at Zion National Park, the boy stepped on some slick algae growing on the streambed near the park's Middle Emerald Pool and slid downstream for several feet. He fell over a ledge and plunged more than 100 feet onto rocks below. The parents argued that park employees were negligent in failing to warn visitors of the algae hazard and failing to erect barriers at the Middle Emerald Pool. These failures allegedly violated specific conduct mandated by the National Park Service's Loss Control Management Guidelines, Zion's Loss Control Management Program plan, and an action plan adopted by the Zion safety committee for dealing with hazards in the Emerald Pools area. The Tenth Circuit disagreed and concluded that each plan or policy afforded employees discretionary judgment.

First, the court concluded that the National Park Service Guidelines were not sufficiently

specific to remove the challenged conduct from the discretionary function exception. Although the guidelines conveyed "the message that safety must be a priority" and identified "a number of elements that should be encompassed by a safety program," they did not "dictate what actions park employees must take in response to particular problems." Id. at 1177-78. They did not "remove Zion employee's choice or judgment regarding what measures to take" or "'specifically proscribe[] a course of action for an employee to follow.'" Id. at 1178 (quoting Berkovitz, 486 U.S. at 536).

Second, although Zion's Loss Control Management Program plan required employees to immediately correct hazards identified as an imminent danger, the court declined to interpret this language so broadly as to divest the employees of discretion. Because the term 'correct' meant something "short of eliminating the danger," the court concluded that employees had discretion to "determine what, if anything, needs to be done to 'correct' the hazard." Id. at 1180. Consequently, the court concluded that the plan did not "provide precise direction as to what suffices for a correction" so as to deprive employees of discretion. Id.

Finally and particularly relevant here, the court concluded that the action plan adopted by the Zion's Safety Committee in response to some of the potential dangers at the Emerald Pools "delegate[d] extensive discretion to Zion managers." Id. In declining to conclude that the plan mandated a particular course of action, the Tenth Circuit found it noteworthy that:

> The managers must determine whether a hazard exists, the severity of the hazard, and whether physical barriers or signs are appropriate safety measures. When considering safety measures, they must assess such factors as whether the measures may actually encourage dangerous conduct by visitors (the existence of a barrier may cause visitors to underestimate the residual danger, and a sign warning of an extreme danger may cause visitors to minimize the peril identified by other signs); the size, placement, and content of signs; whether excessive signage may 'numb' visitors; and whether signs or barriers are likely to withstand the elements (such as a flash flood). In

8

> addition . . . the park managers must weigh any safety measure
> against its impact on the purposes of a national park.

Id.  In light of all of these considerations, the court concluded that the plan extended a great deal of discretion to employees.  With the lessons of Elder in mind, the court considers whether, once adopted, the (1) road maintenance plan, road maintenance schedule, and (2) the annual sign plan mandated a specific course of conduct so as to remove any discretionary judgment.

1. Road Maintenance and Repair

The Forest Service Manuals and Handbooks codify the agency's policy, practice and procedure for, among other things, developing the annual road maintenance plan.  Although the Transportation System Maintenance Handbook requires employees to develop a road maintenance plan, it is a process that Ms. Woolf admits extends employees a great deal of discretion.  (See Ex. 3, 3, Def.'s Mem. Supp. Summ. J., Docket No. 10.)

Although the Forest Handbook directs that employees should "[s]chedule and accomplish work in accordance with the approved plan," the road maintenance plan and road maintenance schedule are working documents.  (Id. 10.)  Governing regulations and policy allow employees to modify these documents, even once adopted, based on a variety of enumerated factors.  (See Suppl. Decl. Kay Shurtz, 2, Docket No. 26.)  Employees may complete, postpone or substitute scheduled road maintenance based on considerations such as the availability of resources, funding, weather conditions, unanticipated road use, and the need to respond to emergencies, natural disaster or other unplanned needs.  (Id.; see also Ex. 3, 3, Def.'s Mem. Supp. Summ. J., Docket No. 10.)  Procedures recognize that employees must have flexibility and discretion if, for example, an early snowstorm shortens the road maintenance season and leaves planned projects unfinished, a shortage of workers forces employees to quickly restructure the adopted list of scheduled priorities, or an earthquake or wildfire in a high traffic area forces employees to

9

abandon the planned maintenance of less frequently used roads in favor of more pressing demands.  Aware of considerations like these, the Forest Service specifically directs employees to "balance [road maintenance] requirements with available resources.  For example, if estimated costs exceed available funding, it may be necessary to defer work, reduce maintenance frequencies, close roads, or allow roads to deteriorate."  (Ex. 3, 3, 11, Def.'s Mem. Supp. Summ. J., Docket No. 10.)

The flexibility and discretion afforded by the adopted plans is similar to those plans and policies in Elder.  A road maintenance plan and schedule simply do not mandate with any specificity a particular course of action.  As with the policies and plans the Tenth Circuit identified as discretionary in Elder, the road maintenance plan and schedule do not dictate what actions employees must take or remove their choice or judgment in the matter.  Even once adopted, the road maintenance plan and schedule do not provide precise direction as to what Forest Service employees must do.  Rather, employees may delay or expedite scheduled road maintenance projects based on consideration of competing challenges, limitations and unanticipated events.[7]

    2.    Sign Placement

Ms. Woolf admits that the creation of the Ogden District's annual sign plan is discretionary.  But, relying on the informal nature of the sign plan, she argues that once it is created it "becomes policy."  (Pl.'s Mem. Opp'n, 8, Docket No. 14.)

Although the Highway Safety Act governs sign placement and maintenance on roads in the National Forests, it does not control Maintenance Level Two roads like the Grizzly Peak 4x4

---

[7]Furthermore, the relevant adopted road maintenance plan and schedule for fiscal years 2000 through 2003 for the Ogden District do not mention the Grizzly Peak 4x4 Road.  (See Exs. E-H, Suppl. Decl. Kay Shurtz, Docket No. 26; see also Def.'s Reply, 7, Docket No. 25.)

Road as "these roads are not intended or maintained for travel by standard passenger cars." (Ex. 5, 11-4, Def.'s Mem. Supp. Summ. J., Docket No. 10.)  As previously explained, individual districts are responsible for installing and maintaining signs on those roads. (Decl. Kay Shurtz, 3, Docket No. 10.)  And employees are simply advised to "manage" these roads "for use by high clearance vehicles" and to "[u]se a limited number of traffic control devices" that conform to the provisions of the Forest Service's Sign Handbook. (Ex. 4, 14, Def.'s Mem. Supp. Summ. J., Docket No. 10.)

Despite Ms. Woolf's representations, the Ogden District does not maintain a written annual sign plan. (Suppl. Decl. Juan Barrientez, 1, Docket No. 28.)  Instead, the roads crew is entrusted with determining sign placement and maintenance needs on Maintenance Level Two roads as it works in the field during the maintenance season. (Id.)  If the roads crew finds that a sign is missing as it is working in the field, for example, it makes plans to order a replacement if it determines that one is needed. (Id.)

Given these facts, the sign plan vests an extraordinary amount of discretion in Forest Service employees.  An unwritten sign plan simply cannot mandate with any specificity what actions Forest Service personnel must take.  Without any formal definition, it cannot remove the choice or judgment of employees.  Seasonal roads crew make judgments regarding the need for sign placement and repair as they are working in the field.  As in Elder, the roads crew has discretion when placing or replacing signs to determine whether hazards exist, how severe those hazards appear to be, and whether a sign would be an appropriate response measure.  Considering the lack of specificity in any governing administrative policies, the impromptu consideration of these factors without any further guidance is the essence of discretion.  Cf. Merando v. United States, 517 F.3d 160, 168 (3rd Cir. 2008) ("The relevant inquiry is whether

the controlling statutes, regulations, and administrative policies mandate that the Park Service locate and manage [a hazard] in any specific manner. If not, . . . decisions as to the precise manner in which to do so, and [the] execution of those decisions, clearly fall within the discretionary function exception.").

### B.     Second Step of Berkovitz

Having concluded that the decisions regarding the maintenance and repair of roads and the placement and repair of signs on the Grizzly Peak 4x4 Road were discretionary, the next question is whether those judgments were the kind that the discretionary function exception was intended to shield. Ms. Woolf argues that the Forest Service's alleged failure to maintain the road in a safe condition beyond the 1.493 mile point, the alleged failure to carry out maintenance plans, and the alleged failure to warn of hazards are not decisions grounded in policy.[8] For this court to conclude otherwise, Ms. Woolf argues would be to allow discretion to "run wild, despite putting the public in harm's way." (Pl.'s Mem. Opp'n, 10, Docket No. 14.)

The inquiry under the second part of the Berkovitz test focuses "'on the nature of the actions taken and on whether they are susceptible to policy analysis.'" Elder, 312 F.3d at 1182 (quoting United States v. Gaubert, 499 U.S. 315, 325 (1991)). When "established governmental policy . . . allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Id. at 1182 (quoting Gaubert, 499 U.S. at 324). The Tenth Circuit recognized this presumption in Elder and noted that the

---

[8] Although Ms. Woolf does not expressly discuss the failure to warn in her discussion of the second prong of Berkovitz, this court assumes based on the rest of her brief that her neglect was unintentional.
  Notably, Ms. Woolf does not present any evidence that the United States actually failed to warn of the hazards associated with the Grizzly Peak 4x4 Road or that it failed to carry out policy regarding the maintenance of that road.

decisions involving the placement of barriers and signs at the Middle Emerald Pool in Zion National Park were presumptively "grounded in the . . . policies" of the National Park Service, which included the recognition that "in a national park whose purpose is to preserve nature and display its beauty to the public, any safety measure must be weighed against damage to natural resources and aesthetic values." Id. at 1181.

Here, aside from the thousands of miles of other types of roads, the Wasatch-Cache National Forest contains more than 1,000 miles of Maintenance Level Two roads like the Grizzly Peak 4x4 Road. These roads are infrequently traveled, narrow, rocky, single lane, and limited to high clearance vehicles. Recognizing the immense challenges in maintaining these roads, Forest Service policies allow employees discretion to prioritize and choose among competing demands.

Presumptively, the decision regarding whether to maintain the Grizzly Peak 4x4 Road beyond the 1.493 mile point or whether to warn of any potential dangers on that road reflect the same policy considerations that prompted the Forest Service to enact the polices that encourage employee discretion. See Gaubert, 499 U.S. at 324 (recognizing presumption). The court's further inquiry confirms the validity of this presumption.

Choices regarding road maintenance and sign placement in a National Forest implicate numerous valid policy considerations, the most compelling of which are public health and safety concerns, the allocation and priority of resources for competing projects, and environmental and natural resource protection. The resources that allow for road maintenance are inherently finite. When considering the relative importance of maintenance on a road or whether to post a sign warning of potential danger, Forest Service personnel must consider various factors, including the risk of any safety hazards, the road's geographic location, its accessibility, how the road affects the need for public access, the road's proximity to other projects and attractions, and the

existence of any unique emergencies.  Forest Service employees must also bear in mind what must be accomplished in the short maintenance season, which lasts for only about five months of the year.  See Blankenburg v. United States, No. 03-16667, 2005 WL 1242128 (9th Cir. May 25, 2005) (recognizing that "the Forest Service is charged with weighing resource program needs, environmental and resource protection requirements, aesthetics, recreational goals, and budgetary concerns in addition to safety when making road maintenance or sign placement decisions").

Considering the prevalence of specifically identified competing policy considerations here, this case is different than Duke v. U. S. Department of Agriculture, 131 F.3d 1407 (10th Cir. 1997).  There, a six-year-old boy suffered from a serious brain injury after a boulder rolled from a hillside and smashed his tent.  In order to allow access to a lake, the government had cut a road through a mountain, creating a slope from which boulders would occasionally roll to the roadside below.  Despite this "specific hazard distinct from other hazards generic to a national forest," the Forest Service encouraged people to park along the road and did not discourage individuals from camping there.  Id. at 1412.  Relying on the second part of Berkovitz, the Tenth Circuit refused to apply the discretionary function exception and to bar the suit brought by the boy and his father.  The court concluded that the Forest Service wrongly attempted to rely simply on "the presumption that was some policy reason for the failure to do anything on the site," without actually identifying it.  Id. (emphasis added).  Such is not the case here as the Government has specifically identified a variety of compelling policy considerations.

## II.     EVEN IF THE COURT HAD SUBJECT MATTER JURISDICTION, UTAH'S LIMITATION OF LANDOWNER LIABILITY ACT WOULD OTHERWISE BAR MS. WOOLF SUIT.

But even if the court did have subject matter jurisdiction, Ms. Woolf's suit would be barred by Utah's Limitation of Landowner Liability Act (ULLLA), Utah Code Ann. §§ 57-14-1

to -14-7.

An owner of land, which may include the United States, owes no duty of care pursuant to the ULLLA to "keep the premises safe for entry or use by any person using the premises for any recreational purpose, or to give any warning of a dangerous condition, use, structure, or activity on those premises to those persons." Id. § 57-14-3; see also Ewell v. United States, 776 F.2d 246, 248 (10th Cir. 1985) (recognizing application to United States as a landowner). Relevant to the arguments here, the ULLLA provides an exception to allow suit against a landowner for the "willful or malicious failure to guard or warn against a dangerous condition." Id. § 57-14-6(1)(a).[9]

Ms. Woolf concedes that the ULLLA applies in this case as the land in question is in located in Utah, and Mr. Jones was engaged in a recreational activity when his accident occurred. But she argues that her suit is not barred because the United States knew about the dangerous condition on the Grizzly Peak 4x4 Road and willfully or maliciously failed to act.

To prove that the United States was willful or malicious within the meaning of Section 57-14-6(1)(a), Ms. Woolf must demonstrate "the elements of . . . a knowledge of a dangerous condition, a knowledge that serious injury is the probable result of contact with the condition, [and] a failure to take any action in the face of this knowledge." Golding v. Ashley Cent. Irrigation Co., 793 P.2d 897, 901 (Utah 1990) (referencing Jim Butler, Outdoor Sports and Torts: An Analysis of Utah's Recreational Use Act, 1988 Utah L. Rev. 47, 71-76 (1988)).

---

[9]The ULLLA features two other exceptions, which are not at issue here. Sections 57-14-6(1)(b) and (c) allow liability for"deliberate, willful, or malicious injury to persons or property" and "an injury suffered where the owner of land charges a person to enter or go on the land or use the land for any recreational purpose." The parties agree that the United States did not charge for admission to the area surrounding and including the Grizzly Peak 4x4 Road, and there are no improvements like restrooms or picnic grounds in the area.

Ms. Woolf has failed to meet this burden. As the party opposing summary judgment, Ms. Woolf may not "rest on the allegations in the complaint, but must respond with some factual showing of the existence of a genuine issue of material fact." Ewell, 776 F.2d at 248. She does not present facts sufficient to support the application of Section 57-14-6(1)(a). She does not present facts that identify with any specificity the dangerous condition at issue much less prove that the United States had a knowledge of this condition. As the undisputed facts reveal, the cause of Mr. Jones's accident is simply unknown. It might have been a rock slide. It might have been a fence post. It might have been the severe weather that caused search and rescuers to call of the search for Mr. Jones. Or it might have been due to a variety of other circumstances, some of which might have had little to do with the condition of the Grizzly Peak 4x4 Road.[10]

Absent facts that would trigger the proper application of Section 57-14-6(1)(a), the court concludes that the United States did not owe a duty to Mr. Jones to keep the Grizzly Peak 4x4 Road safe for entry or use or to give any warning of a dangerous condition. See Utah Code Ann. § 57-14-3.

>

>

>

>

---

[10]Moreover, based on what evidence is in the record, the United States actually did attempt to guard against the known dangerous condition on the Grizzly Peak 4x4 Road. After the United States became aware that the road was not passable beyond the 1.493 mile point, it placed a sign at the 1.0 mile point indicating that no motor vehicles were allowed. Ms. Woolf presents no evidence that this sign was not in place at the time of Mr. Jones's accident. Further, before Mr. Jones's accident, the United States had no knowledge of any motor vehicle accidents on the Grizzly Peak 4x4 Road such that it should have known that serious injury was the probable result of contact.

## CONCLUSION

For the foregoing reasons, the United States motion for summary judgment is GRANTED. (Docket No. 9.) Because the court did not rely on the facts implicated by Ms. Woolf's motion to strike, Ms. Woolf's motion is DISMISSED as moot. (Docket No. 15.)

DATED this 31st day of March 2009.

BY THE COURT:

TENA CAMPBELL
Chief Judge